UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VALDOVINOS,<br><br>      Plaintiff,<br><br>          v.<br><br>CUSHMAN & WAKEFIELD U.S., INC., et al.,<br><br>      Defendants. | Case No.  21-cv-01924-JCS<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 42 |

## I.      INTRODUCTION

Defendants Cushman & Wakefield U.S., Inc. ("C&W") and Kevin O'Hair move for summary judgment on Plaintiff Cecilia Valdovinos's claims in this employment discrimination case.  The Court finds the matter suitable for resolution without oral argument and VACATES the motion hearing previously set for May 13, 2022.  The case management conference set for the same time remains on calendar.  For the reasons discussed below, Defendants' motion is DENIED.[1]

## II.      BACKGROUND

### A.      Evidentiary Record

Because the Court views the evidence in the light most favorable to Valdovinos for the purpose of Defendants' motion for summary judgment, this factual summary is presented generally in that light.  It is not intended as a complete recitation of the evidentiary record and should not be construed as resolving any issue of fact that might be disputed at trial.

Valdovinos worked in a variety of facility management roles for a number of management

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court<br>Northern District of California

United States District Court
Northern District of California

companies at Google's offices in Mountain View for several years, before C&W took over management of that property and hired her in 2017 or 2018.  *See* Workman Decl. (dkt. 43-1) Ex. E (Valdovinos Dep.) at 20:1–23:1, 32:3–6.  Valdovinos is Mexican, and informed O'Hair that she is Mexican during her employment at C&W.  *See id.* at 136:3–8.  She was diagnosed with Bell's palsy in 2015, which causes temporary paralysis of half of her face.  Valdovinos Decl. (dkt. 43-2) ¶ 2.  C&W has a policy that "prohibits unlawful harassment and discrimination based on color, creed, gender, sex, national origin, and physical disability, among other protected characteristics," as well as "retaliation against any employee for reporting harassment or discrimination."  McCorry Decl. (dkt. 42-2) ¶ 3 & Ex. A.

In December of 2018, Valdovinos changed positions at C&W to be a facilities manager at the Workday headquarters in Pleasanton.  Workman Decl. Ex. E (Valdovinos Dep.) at 49:22–50:2. She interviewed for that position with Defendant O'Hair, who was chief engineer at that office, and the person whose role she was taking over.  *Id.* at 51:3–13, 56:25–57:2.  During the interview, O'Hair described the role as a "shit account" and disparaged the performance of the other interviewer, which Valdovinos found unprofessional.  *Id.* at 111:12–112:6.  Her offer letter was "[o]n behalf of Kevin O'Hair" and indicated that she would be reporting to O'Hair.  Workman Decl. Ex. H; *see id.* Ex. E (Valdovinos Dep.) at 46:20–47:9.  Valdovinos reported to O'Hair for around four months until account manager Stephanie Grey was hired and Valdovinos began reporting to her.  Workman Decl. Ex. E (Valdovinos Dep.) at 64:17–65:10, 104:9–19.

Valdovinos, O'Hair, and a few other C&W employees had desks in an open office area of the Workday building.  *Id.* at 57:19–60:3.  Valdovinos was not in the same cubicle as O'Hair but was within view of his desk, around ten feet away.  *Id.* at 60:18–61:6, 107:23–108:2.

According to Valdovinos, O'Hair made inappropriate comments on a "daily" basis, including racial comments about Mexican employees making tamales or looking like gangsters, sexual comments including referring to his "porn star mustache," comments about employees' appearances including that he could not hire an otherwise qualified candidate who was obese because "[h]ow is that going to look," and comments about religion and politics, among others. *Id.* at 112:19–113:25; *see id.* at 130:5–131:8.  O'Hair referred to a C&W employee as a "lazy

1      Mexican," and in a conversation regarding a search for job candidates, said that Mexicans were

2      lazy and that he did not want to hire another Mexican employee, a view that he would later repeat

3      when discussing specific candidates he did not want to hire.  *Id.* at 120:10–122:13.[2]

4              O'Hair's demeaning comments regarding women were "constant."  *Id.* at 125:9–17.  On

5      twenty to thirty occasions, he said that women could not handle the job, which should be left to

6      men.  *Id.*at 125:11–23, 127:11–19. O'Hair once made a comment not to let Valdovinos touch

7      something because "her breasts will get in the way."  *Id.* at 125:14–20.   After Grey was hired to

8      supervise both O'Hair and Valdovinos, O'Hair said that Grey "dressed like an old lady," that she

9      was unfit for her position, and that he would push her down the stairs if he had to deal with her,

10     and repeatedly said that he would not deal with her and that Valdovinos would have to deal with

11     her instead.  *Id.* at 115:9–117:2.  O'Hair characterized another female C&W employee as hard to

12     deal with, and referred to a female Workday employee as a "bitch" who was not fit for her job.  *Id.*

13     at 118:1–23.  O'Hair also at one point said that a male coworkers was dancing like a stripper.  *Id.*

14     at 114:24–115:2.

15             Valdovinos told O'Hair, Human Resources, and others at C&W about her Bell's palsy.  *Id.*

16     at 89:4–90:8.  Specifically, in the context of a conversation about "how stressed everybody was,"

17     she told O'Hair that she had to limit her stress because her face would start twitching due to that

18     impairment.  *Id.* at 90:9–18.  O'Hair responded with a joke about the level of stress in the job, and

19     told her "good luck," which Valdovinos considered to be not "very nice," but brushed off at the

20     time.  *Id.* at 91:9–92:14.  Valdovinos states in her declaration that O'Hair later made "offensive

21     comments to [her] all the time," including "disparaging comments about the symptoms of [her]

22     Bell's Palsy."  *Id.* ¶ 4.  According to Valdovinos, O'Hair frequently "remarked, in a mocking tone

23     of voice, 'Uh oh, she looks stressed again,'" and told other employees that Valdovinos should be

24     left alone or else her eyes would flicker and her face would twitch.  *Id.*

25             On April 8, 2019, Valdovinos reached out to Laura McCorry in C&W's human resources

26

27

28     _____

       [2] O'Hair also said that he did not want to hire "Irish drunks."  Workman Decl. Ex. E (Valdovinos
       Dep.) at 123:16–21.

United States District Court
Northern District of California

department to share her concerns about O'Hair.  *See* Workman Decl. Ex. L at -110–11[3]; *id.* Ex. E (Valdovinos Dep.) at 138:9–15, 145:21–25; *see id.* Ex. N (McCorry's notes from her conversation with Valdovinos).  Valdovinos sent another email the next day indicating that she was relieved to have spoken to McCorry but was concerned about retaliation by O'Hair, and noting that he had mocked her Bell's palsy that day.  Workman Decl. Ex. L at -110.  McCorry testified that she did not recall ever seeing that email at the time and would have investigated O'Hair's comment if she had seen it, but she did not believe any investigation of that particular complaint was ever conducted.  Workman Decl. Ex. C (McCorry Dep.) at 98:15–101:18, 104:4–10.

McCorry and Terri Melzer, a regional account executive, spoke with O'Hair on April 10, 2019.  Workman Decl. Ex. L at -106.  O'Hair admitted that he probably referred to "his mustache looking like a 'porn star' mustache" and made comments about tamales, but denied other allegations.  *Id.*; *see* Workman Decl. Ex. BB (meeting notes).  McCorry testified at her deposition that she determined that O'Hair's "behavior didn't align with the kind of environment that we're trying to create," but that she did not think they found "an overt violation of the policy."  Workman Decl. Ex. C (McCorry Dep.) at 34:2–15. According to McCorry, an investigation involving witness interviews was a typical response to allegations of discrimination and harassment, *id.* at 19:20–20:15, but they did not interview any witnesses in response to Valdovinos's complaint because the only witness Valdovinos identified was O'Hair's "right-hand person," who Valdovinos believed was untrustworthy and "would agree with everything that [he] says and stick up for him," *id.* at 34:24–35:10.

McCorry sent Valdovinos an email the same day saying that they had spoken with O'Hair and expected his behavior to improve, and that although she had not mentioned Valdovinos's name, she had informed O'Hair of C&W's anti-retaliation policy.  Workman Decl. Ex. L at -108. McCorry marked the incident as closed in C&W's records, listing the resolution as "Coaching given."  *Id.* at -111.  She considered an email that Melzer sent to O'Hair memorializing their conversation to be a "verbal warning," and testified that no other disciplinary action was taken.

---

[3] Citations in this order to page numbers beginning with hyphens refer to Bates numbers, with leading letters and zeros omitted.

United States District Court
Northern District of California

1    Workman Decl. Ex. C (McCorry Dep.) at 65:2–7.

2        Valdovinos replied a couple of days later, saying that she had taken time off work because

3    the "situation ha[d] caused her anxiety and to physically feel sick."  Workman Decl. Ex. L

4    at -107–08.  McCorry responded with information about C&W's employee assistance program.

5    *Id.* at -107; Workman Decl. Ex. E (Valdovinos Dep.) at 160:11–23.  Although McCorry told

6    Valdovinos that she would follow up the next week, McCorry did not recall at her deposition

7    whether she actually did so, and her records do not include a note indicating that she did so.

8    Workman Decl. Ex. C (McCorry Dep.) at 93:25–95:6.

9        After Valdovinos complained about O'Hair, her work environment "got worse" and

10   O'Hair began treating her worse in "[e]very way you can think of":

> He threw things on my desk. He threw bills on my desk. He then
> started openly commenting about me and what a shitty job I was
> doing, to the client directly. He then would just not attend meetings
> and make me do it on my own. He then would demand things instead
> of, you know, working together and saying, "Hey, can we do this
> together?" It was demanding. It totally changed.

15   Workman Decl. Ex. E (Valdovinos Dep.) at 147:9–25.

16       When clients at Workday were dissatisfied with C&W's services, O'Hair "informed them

17   that it's [Valdovinos's] responsibility and that he was going to let [her] fry [her]self," including

18   with respect to things like janitorial service where the contract fell within Valdovinos's purview

19   but she was not responsible for specific performance levels and was actively working to improve

20   the situation.  *Id.* at 148:10–149:17.  On multiple occasions, Valdovinos heard O'Hair badmouth

21   her to clients:

> That I was doing a shitty job, and go -- he would point at me and
> "Take your comments over there to her." And on a constant, "It was
> not my job. Go over there. And if she's doing a shitty, job, then get
> rid of her."

*Id.* at 150:5–14.  O'Hair's comments had an effect on Valdovinos's relationship with Workday

employees:

> The client started then speaking freely about how crappy our vendors
> were, and I was responsible for it, and if I didn't change it, then I'd be
> gone. They -- everything changed. I was then sitting by myself.
> Nobody engaged with me.

1     *Id.* at 148:4–8.

2          O'Hair told the C&W engineers who reported him not to deal with Valdovinos, and they

3     stopped returning her calls or having meetings with her, which left her unable to update the client

4     on the status of issues at the building or dispatch engineers to resolve problems like a clogged

5     toilet. *Id.* at 152:23–154:21. One of the engineers told Valdovinos that "Kevin wants us to go

6     directly through him, not to you." *Id.* at 153:22–24.

7          Melzer, the regional account executive, did not recall anyone bringing concerns about

8     Valdovinos's performance to her attention, except one instance where O'Hair raised a concern

9     about Valdovinos's attendance at the worksite. Workman Decl. Ex. A (Melzer Dep.) at 47:1–

10    48:12. Melzer remembered Grey telling her that Valdovinos continued to have issues with O'Hair

11    after she made her initial complaint, to which Melzer told Grey that she should report any such

12    issues to human resources, and Grey said that she did. *Id.* at 40:14–45:10. Melzer agreed at her

13    deposition that much of O'Hair's alleged conduct, if it occurred as Valdovinos reported, would

14    violate C&W's policies. *Id.* at 67:7–75:20.

15         On June 6, 2019, O'Hair sent Valdovinos an email asking her to create a purchase order.

16    Workman Decl. Ex. R. at -93; *see id.* Ex. E (Valdovinos Dep.) at 170:11–25. Typically, under

17    procedures established by the finance team at C&W, purchase orders took twenty-four to forty-

18    eight hours to create from the time of a request, although it was possible to create them more

19    quickly in at least some circumstances. Workman Decl. Ex. E (Valdovinos Dep.) at 171:17–

20    172:19. O'Hair followed up around noon the next day asking if the request could be expedited or

21    if it would be possible to "get a blanket PO for these types of services." Workman Decl. Ex. R at -

22    92; *see id.* Ex. E (Valdovinos Dep.) at 171:1–9. His request did not provide the sort of

23    information Valdovinos would need to create a purchase order without significant legwork on her

24    part to follow up with Workday for more details, in addition to her other responsibilities on a

25    difficult contract. Workman Decl. Ex. E (Valdovinos Dep.) at 172:24–173:23. In her view,

26    O'Hair "knew it was insanely impossible to ask of this." *Id.* at 173:2–3. O'Hair followed up

27    again at 4:26 PM saying that it was "taking too long" and that he was "requesting the work done

28    by the contractor" because the "CEO of Workday needs it now," and requesting to use

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Valdovinos's credit card.  *See* Workman Decl. Ex. R at -92; *see id.* Ex. E (Valdovinos Dep.) at

2   174:6–13.  Valdovinos responded that they had already discussed that she would need twenty-four

3   to forty-eight hours to prepare purchase orders until O'Hair and his team were able to do that

4   themselves, and that she could not meet his timeline but would request training on the process for

5   his team.  *See* Workman Decl. Ex. R at -91–92; *see id.* Ex. E (Valdovinos Dep.) at 174:16–175:10.

6   O'Hair had refused to attend meetings about that issue in the past.  Workman Decl. Ex. E

7   (Valdovinos Dep.) at 175:11–22.  O'Hair replied that he was "pretty sure that [Valdovinos's]

8   email is inappropriate and disrespectful," and Valdovinos responded that O'Hair's request had

9   been rude and her response was consistent with their previous discussions and agreement.

10  Workman Decl. Ex. R at -91; *see id.* Ex. E (Valdovinos Dep.) at 176:4–13, 177:9–10.

11         Valdovinos was near a breaking point and believed she was going to resign.  Workman

12  Decl. Ex. E (Valdovinos Dep.) at 167:13–17.  A few minutes after her exchange with O'Hair, she

13  sent a message to Grey and Melzer reading as follows:

> Thank you both for giving me the opportunity to work with CW on
> the Workday account. Unfortunately I can no longer tolerate Kevin's
> unprofessional demeanor and rude attitude. I have tried my best to be
> patient and stomach his disrespectful habits but there comes a time
> when enough is enough. I can not believe he is allowed to continue to
> speak, act and treat people the way he does.
>
> I will send a formal notification soon.

19  Workman Decl. Ex. Q; *see id.* Ex. E (Valdovinos Dep.) at 167:3–11.  Valdovinos did not resign at

20  that time.

21         The next morning, on a Saturday, O'Hair emailed Valdovinos, Grey, and Melzer to say

22  that O'Hair "gave [Valdovinos] a directive and [she] questioned it," and that Workday's CEO

23  found the delay in resolving the situation unfortunate and would consider finding someone else to

24  provide the needed services if C&W could not.  Workman Decl. Ex. R at -90–91; *see id.* Ex. E

25  (Valdovinos Dep.) at 176:14–177:10.

26         Valdovinos forwarded that email, which included their previous exchange, to McCorry,

27  saying that she felt "harassed and threatened by [O'Hair's] emails" and that it was not right that

28  she was "not allowed to question his requests or stand up for [her]self," reiterating that she felt like

United States District Court
Northern District of California

1    she had no choice but to resign, and requesting any support that McCorry could provide.

2    Workman Decl. Ex. R at -90; *see id.* Ex. E (Valdovinos Dep.) at 177:19–178:24.  McCorry

3    responded that she would speak to Melzer and Grey about the issue, and recorded in C&W's

4    incident log that she had done so.  Workman Decl. Ex. R at -90; *id.* Ex. L at -112–13.  McCorry

5    testified that she focused her review on the particular email exchange Valdovinos had forwarded,

6    without following up to determine why Valdovinos believed O'Hair was harassing and threatening

7    her, and since in McCorry's view the email exchange involved a "business task issue," she left it

8    to Melzer to resolve.  Workman Decl. Ex. C (McCorry Dep.) at 105:1–110:18.

9        Valdovinos kept notes regarding her experience at C&W, both handwritten in a notebook

10   and typed in a Word document.  Workman Decl. Ex. E (Valdovinos Dep.) at 194:11–196:23.  She

11   destroyed the handwritten notes at some point since the events at issue.  *Id.* at 195:21–25 ("I think

12   at one point probably burned it.").  Her intention in keeping the Word document was to be able to

13   look back at it for her own purposes "[t]o make sure [she] wasn't going insane."  *Id.* at 196:24–

14   197:11.  The Word document includes notes from interactions such as O'Hair asking Valdovinos

15   if she would be making tamales because she is Mexican, jokingly characterizing his facial hair as a

16   "70s porn mustache," smirking after Valdovinos objected to him referring to being "raped" by

17   bills from a vendor, and telling a male coworker to "stop acting like a girl" and then pointing and

18   laughing at Valdovinos.  Workman Decl. Ex. K; *id.* Ex. E (Valdovinos Dep.) at 199:14–25,

19   200:10–21, 201:4–17, 204:15–205:7.  Most of the specific incidents involving O'Hair date to the

20   early portion of Valdovinos's tenure at the Pleasanton office, but undated notes indicate that Grey

21   told Valdovinos that "Kevin will always be Kevin but just work pass [sic] it" and that Valdovinos

22   "stopped working at [her] desk to avoid Kevin and Paul."  Workman Decl. Ex. K at -44.  Notes

23   from August 2019 indicate that Valdovinos spoke to coworkers about her concerns regarding

24   O'Hair, including that his "behavior is impacting the team in so many ways and someone needs to

25   address it because it's not changing."  *Id.* at -45.

26        Valdovinos twice spoke to a coworker, Shannon Prince-Thomas, about how O'Hair had

27   mistreated her, including a conversation on the day she resigned from C&W.  Workman Decl. Ex.

28   I (Prince-Thomas Dep.) at 22:1–22:21.  Prince-Thomas encouraged to Valdovinos to go home for

the day because she was visibly upset, and encouraged her to stand up for herself and speak to human resources. *Id.* at 24:13–25:6. Immediately following their second conversation, Prince-Thomas went to speak to Grey about the issue. *Id.* at 22:22–23. Prince-Thomas was never interviewed by C&W's human resources department during Valdovinos's tenure with the company. *Id.* at 30:16–19.

Valdovinos resigned from C&W on August 27, 2019. Her personal notes indicate that a breaking point for her was Grey responding insensitively to Valdovinos having taken time off after her mother was injured in a robbery and to O'Hair requesting time off after his nephew's suicide. Workman Decl. Ex. K at -45. She sent McCorry an email at 4:45 that day stating that it was her last day, citing "increasing levels of stress, a hostile work environment and lack of support," as well as the specific incident of Grey's response to Valdovinos's and O'Hair's family tragedies. Workman Decl. Ex. S. McCorry responded that she would process Valdovinos's resignation but hoped to talk to her if Valdovinos was willing, because McCorry "thought we had addressed the issues with Kevin [O'Hair] but it sounds like there's much more happening there." Workman Decl. Ex. T. McCorry did not ultimately conduct any further investigation of O'Hair's conduct at that time. Workman Decl. Ex. C (McCorry Dep.) at 118:2–6.

After Valdovinos resigned from C&W, the California Employment Development initially denied her application for unemployment benefits on the basis that she voluntarily left her job. Valdovinos Decl. ¶ 3. In a decision offered as an attachment to Valdovinos's declaration, the California Unemployment Insurance Appeals Board reversed the denial of benefits, finding that Valdovinos had good cause to leave the job based on her mistreatment by O'Hair. *Id.* ¶ 3 & Ex. C. Defendants object to that decision as hearsay, Reply (dkt. 44) at 8, and this order does not rely on it, leaving the question of its admissibility for resolution on motions in limine. Since resigning from C&W, Valdovinos has worked as a teacher, speech therapist, and behavioral coach for her daughter, who has autism. Workman Decl. Ex. E (Valdovinos Dep.) at 65:17–66:20.

More than a year after Valdovinos left C&W, another employee—building engineer John Winkler—complained to Prince-Thomas about O'Hair verbally harassing him with sexual comments, as well as failing to report "an electrical safety issue." Workman Decl. Ex. I (Prince-

9

United States District Court
Northern District of California

Thomas Dep.) at 47:24–49:7.  Winkler described O'Hair's harassment as "soul-crushing" and "constant," and said that "he couldn't take it anymore."  Workman Decl. Ex. I (Prince-Thomas Dep.) at 61:18–19, 67:1–4.  Winkler indicated that he had not reported anything sooner because he feared retaliation from O'Hair, who had also threatened to retaliate against him if he helped the facility manager who had replaced Valdovinos.  *Id.* at 64:1–65:20.  Prince-Thomas spoke to McCorry, who was "shocked" and arranged for a colleague the human resources department's investigations team to look into it further.  *Id.* at 68:2–11; *see also* Workman Decl. Exs. U–W (investigation notes, including witness interviews).  O'Hair was ultimately fired due to the safety violation.  Workman Decl. Ex. I (Prince-Thomas Dep.) at 82:10–83:6; *id.* Ex. X.

Valdovinos's expert witness Vida Thomas offers an opinion that C&W did not meet established standards of care in the human resources field in its handling of Valdovinos's complaints, in that it failed to conduct a sufficient investigation, failed to take appropriate remedial action, and failed to monitor the workplace for retaliation and further misconduct.  *See* Workman Decl. Ex. AA (Thomas Decl.) ¶ 12.

### B.   Valdovinos's Claims and Procedural History

Valdovinos filed this action in the California Superior Court for Alameda County asserting the following claims, all under California's Fair Employment and Housing Act ("FEHA"): (1) discrimination based on sex, against C&W, Notice of Removal Ex. A (Compl.) ¶¶ 14–20; (2) discrimination based on national origin, against C&W, *id.* ¶¶ 21–26; (3) discrimination based on physical disability, against C&W, *id.* ¶¶ 27–39; (4) harassment based on sex, against C&W and O'Hair, *id.* ¶¶ 40–46; (5) harassment based on national origin, against C&W and O'Hair, *id.* ¶¶ 47–52; (6) harassment based on physical disability, against C&W and O'Hair, *id.* ¶¶ 53–64; (7) failure to take reasonable steps to prevent disability and harassment, against C&W, *id.* ¶¶ 65–71; (8) retaliation, against C&W, *id.* ¶¶ 72–76; and (9) constructive wrongful termination in violation of public policy, against C&W, *id.* ¶¶ 77–81.

Defendants removed to this Court, asserting diversity jurisdiction under 28 U.S.C. § 1332(a) because Valdovinos is a citizen of California, C&W is a citizen of Illinois and Missouri, O'Hair is a citizen of Nevada, and the amount in controversy exceeds $75,000.  *See generally*

1    Notice of Removal.  The Court finds that subject matter jurisdiction is proper.  The parties have

2    not filed any contested motions prior to the present motion for summary judgment.

3        **C.    The Parties' Arguments**

4        Defendants argue that Valdovinos's discrimination claims fail because she has not shown

5    an adverse employment action and there is no evidence that either C&W or O'Hair harbored a

6    discriminatory motive.  Mot. (dkt. 42) at 13–14.  With respect to O'Hair, Defendants assert that he

7    is entitled to a presumption of nondiscrimination because he was the person who hired

8    Valdovinos.  *Id.* at 14.  As for Valdovinos's harassment claims, Defendants contend that she has

9    not sufficiently alleged a hostile work environment based on any particular protected class,

10   breaking out their analysis to consider O'Hair's purported comments regarding Valdovinos's sex,

11   national origin, and disability separately, and arguing that none of those categories alone rises

12   beyond isolated or sporadic hostile comments.  *Id.* at 14–17.  Defendants argue that they are

13   entitled to summary judgment on Valdovinos's failure-to-prevent claim because C&W has

14   reasonable policies and promptly responded to Valdovinos's complaints, and also because the

15   claim is dependent on the discrimination claims that Defendants believe are deficient.  *Id.* at 17–

16   19.  They also contend that Valdovinos's retaliation claim fails because she has not shown an

17   adverse employment action, *id.* at 19–20, and that her constructive termination claim fails because

18   she has not met her burden to show that her resignation was anything but voluntary, *id.* at 21–22.

19   Valdovinos contends that she has provided sufficient evidence to proceed on all of her claims.  *See*

20   *generally* Opp'n (dkt. 43).

21   **III.    ANALYSIS**

22       **A.    Legal Standard**

23       Summary judgment on a claim or defense is appropriate "if the movant shows that there is

24   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

25   law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

26   the absence of a genuine issue of material fact with respect to an essential element of the non-

27   moving party's claim, or to a defense on which the non-moving party will bear the burden of

28   persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

United States District Court
Northern District of California

11

1    Once the movant has made this showing, the burden then shifts to the party opposing

2    summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.*

3    (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

4    disputed must support the assertion by . . . citing to particular parts of materials in the record

5    . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

6    substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v.*

7    *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of

8    identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan*

9    *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court "'to scour the

10   record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F.*

11   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

12   A party need not present evidence to support or oppose a motion for summary judgment in

13   a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

14   to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.

15   2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

16   are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.,*

17   *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all

18   reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

19   (2007), but where a rational trier of fact could not find for the non-moving party based on the

20   record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

21   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

22   **B.  Discrimination Claims**

23   FEHA prohibits employment discrimination based on "national origin, ancestry, physical

24   disability, . . . medical condition, . . . sex, gender," and several other protected categories. Cal.

25   Gov't Code § 1240(a). "Because of the similarity between state and federal employment

26   discrimination laws, California courts look to pertinent federal precedent when applying

27   [California anti-discrimination] statutes." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000).

28   Discrimination can be proven by direct or circumstantial evidence. *Godwin v. Hunt*

United States District Court
Northern District of California

12

*Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998).  Applying California law, the Ninth Circuit has held that a mere comment suggesting the existence of bias can be direct evidence of discriminatory animus, "which, if believed, proves the fact of discriminatory animus without inference or presumption." *Id.* at 1221 (cleaned up).  In that case, the plaintiff "produced evidence of direct discrimination" in the form of "a statement . . . that [a supervisor] 'did not want to deal with another female after having dealt with'" a particular female coworker, which the court held sufficient to show "the existence of bias [with] no inference . . . necessary to find discriminatory animus." *Id.*  The court noted earlier precedent finding evidence that an "employer believed that the female candidates get 'nervous' and 'easily upset,'" "referred to a Mexican-American employee as a 'dumb Mexican,'" or "referred to [a] female plaintiff as 'an old warhorse' and to her students as 'little old ladies'" sufficient to show direct evidence of animus.  *Id.* (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997); *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)[4]).

Here, if the jury credits Valdovinos's testimony that O'Hair said he did not want to hire another Mexican employee, Workman Decl. Ex. E (Valdovinos Dep.) at 151:10–21, and that he felt women were unsuited to jobs that should be left to men, *id.* at 125:11–13—not to mention her testimony regarding his calling a coworker a "lazy Mexican," *id.* at 120:10, his statement that Valdovinos could not pick something up because her breasts would interfere, *id.* at 125:14–16, and other purported bigoted comments—the jury could find those statements sufficient to show animus towards Valdovinos on account of her sex or national origin.

Similarly, the record includes evidence of O'Hair mocking Valdovinos's disability.  *See* Valdovinos Decl. ¶ 4 (discussing O'Hair's "mocking tone of voice" when addressing Valdovinos's disability).  Valdovinos reported that O'Hair told one of his friends at the office that he "like[d] to see [Valdovinos's] eye flicker," and that when she objected to that comment, he responded "it's ok I like to be knocked out."  Workman Decl. Ex. O at -82.  She also testified that

---

[4] *Sischo-Nownejad* has been superseded by statute on unrelated grounds as recognized in *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005).

United States District Court
Northern District of California

1    when she first told him of her disability and how it could be triggered by stress, he responded with

2    a joke and wished her "good luck" in her job.  Workman Decl. Ex. E (Valdovinos Dep.) at 91:4–

3    11.  A jury that credited these statements might conclude that O'Hair believed Valdovinos was

4    unsuited for the job or that he otherwise held animus towards her on account of her Bell's palsy.

5          Defendants rely on the "same-actor" presumption to argue that despite O'Hair's comments

6    and conduct, Valdovinos cannot show discriminatory intent.  In a 1996 decision, the Ninth Circuit

7    held that "where the same actor is responsible for both the hiring and the firing of a discrimination

8    plaintiff, and both actions occur within a short period of time, a strong inference arises that there

9    was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th

10   Cir. 1996).  That rule "has lost some of its persuasive appeal in recent years," and has been called

11   into question by more recent California decisions holding that it "could threaten to undermine the

12   right to a jury trial by improperly easing the burden on employers in summary judgment." *Cornell

13   v. Berkeley Tennis Club*, 18 Cal. App. 5th 908, 937 (2017) (cleaned up); *see also Owen ex rel.

14   Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) (holding that an interpretation of state

15   law "was only binding in the absence of any subsequent indication from the California courts that

16   our interpretation was incorrect.").  Regardless, the plaintiff in *Bradley* "produced no meaningful

17   evidence . . . that her supervisor harbored discriminatory animus towards her because she was a

18   woman."  104 F.3d at 270.  The facts here differ starkly, and the presumption, to the extent it is

19   valid at all under California law, "is rebutted by the direct evidence of discriminatory animus

20   based on racial comments" and comments regarding sex and disability. *See Sampson v. Vita-Mix

21   Corp.*, No. 17cv233-GPC(BGS), 2018 WL 3064486, at *11 (S.D. Cal. June 21, 2018).  Perhaps

22   the jury might put some stock in O'Hair's role in hiring Valdovinos for her job in Pleasanton, or

23   perhaps not, but Defendants are not entitled to summary judgment on that basis.

24         Defendants also contend that Valdovinos has not shown an adverse employment action.

25   Although the Ninth Circuit defines adverse employment actions "broadly," *see Little v.

26   Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2001), "[n]ot every employment

27   decision amounts to an adverse employment action," *Brooks v. City of San Mateo*, 229 F.3d 917,

28   929 (9th Cir. 2000) (quoting *Stroher v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir.

United States District Court
Northern District of California

14

1996)) (considering a Title VII retaliation claim).  In order to support a discrimination claim, an employer's action must be "one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'"  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)) (alterations in original).  "Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052 (2005).  FEHA "protects an employee against unlawful discrimination with respect not only to so-called 'ultimate employment actions' such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Id.* at 1053–54.

Valdovinos contends that she meets this element of her FEHA claim due to her purported constructive discharge.

> Constructive discharge, like actual discharge, is a materially adverse employment action. Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation.
>
> In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. To be "intolerable" or "aggravated," the employee's working conditions must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position would have felt compelled to resign.

United States District Court
Northern District of California

*Steele v. Youthful Offender Parole Bd.*, 162 Cal. App. 4th 1241, 1253 (2008) (cleaned up).

Here, Valdovinos has offered evidence that O'Hair instructed engineers not to cooperate with her in a manner that prevented her from doing her job effectively,[5] and that he repeatedly described her to a client as doing a "shitty job" and campaigned for the client to ask for her removal—including in meetings where Valdovinos was present—among other serious mistreatment.  Workman Decl. Ex. E (Valdovinos Dep.) at 149:18–150:23, 152:18–21.  Despite Valdovinos submitting a second complaint to human resources reporting that she felt compelled to resign because she continued to be "harassed and threatened" by an "out of control" O'Hair, Workman Decl. Ex. R at -90, and despite her subsequent supervisor Grey's awareness of continuing issues between Valdovinos and O'Hair, Workman Decl. Ex. A (Melzer Dep.) at 40:14–45:10, C&W apparently took no meaningful further action to investigate or ameliorate the situation.  A jury might reasonably find such conduct sufficiently egregious to support a constructive discharge claim.  And in conjunction with the evidence of overt animus discussed above, the jury might also conclude that O'Hair engaged in the conduct at issue on account of Valdovinos's national origin, sex, or disability.

Defendants contend that Valdovinos's resignation email, which does not specifically mention discrimination or any conduct by O'Hair, undermines her claim that she resigned due the effects of his discriminatory animus.  Mot. at 22.  Her email referred to a "panic attacks" and "health issues as a result of high stress" due to "a hostile work environment" and "unprofessional toxic employees."  Workman Decl. Ex. S.  Valdovinos's colleague Prince-Thomas testified that on Valdovinos's last day at C&W, she was visibly distraught and told Prince-Thomas that O'Hair's conduct made her feel inferior.  Workman Decl. Ex. I (Prince-Thomas Dep.) at 22:10–23–25.  McCorry also responded the resignation email by saying that she "thought we had addressed the issues with Kevin but it sounds like there's much more happening there," indicating that she understood Valdovinos's resignation as related to her previous concerns about O'Hair.  Workman

---

[5] This alone might well constitute an adverse employment action even if Valdovinos had not been compelled to resign, but she has not raised that argument with respect to her discrimination claims, and the Court need not decide that question.

United States District Court
Northern District of California

1   Decl. Ex. T.  Defendants can of course argue to the jury that Valdovinos's failure to address in her

2   email specific misconduct by O'Hair or disparate treatment based on a protected class suggests she

3   resigned for other reasons, but a reasonable jury might nevertheless conclude that discrimination

4   drove Valdovinos to resign.  Defendants' motion for summary judgment is therefore DENIED as

5   to all three of Valdovinos's discrimination claims.

6          **C.     Discharge in Violation of Public Policy**

7          The California Supreme Court has held that "FEHA's policy against . . . discrimination

8   satisfies each of the four requirements that this court has established as essential to support a

9   common law tort claim for wrongful discharge in violation of public policy." *Stevenson v.*

10  *Superior Court*, 16 Cal. 4th 880, 897 (1997).  Thus, for the same reasons discussed above with

11  respect to her FEHA discrimination claims based on constructive discharge, Valdovinos may also

12  proceed to trial on her common law claim for constructive discharge in violation of public policy.

13  Defendants' motion is DENIED as to that claim.

14         **D.     Harassment Claims**

15         FEHA specifically prohibits discriminatory harassment in addition to discrimination in

16  terms of employment.  Cal. Gov't Code § 12940(j).  "The elements of such a cause of action are:

17  (1) plaintiff belongs to a protected group; (2) plaintiff was subject to unwelcome . . . harassment;

18  (3) the harassment complained of was based on [a protected class]; (4) the harassment complained

19  of was sufficiently pervasive so as to alter the conditions of employment and create an abusive

20  working environment; and (5) respondeat superior." *Jones v. Dep't of Corr. & Rehab.*, 152 Cal.

21  App. 4th 1367, 1377 (2007) (cleaned up); *see also Ortiz v. Dameron Hosp. Assn.*, 37 Cal. App. 5th

22  568, 581 (2019).

23         As a general rule, "to be actionable, alleged . . . harassment cannot be occasional, isolated,

24  sporadic, or trivial; the plaintiff must show a concerted pattern of harassment of a repeated,

25  routine, or generalized nature." *Haberman v. Cengage Learning, Inc.*, 180 Cal. App. 4th 365, 385

26  (2009).  But the California legislature has made clear that even a "single incident of harassing

27  conduct is sufficient to create a triable issue regarding the existence of a hostile work environment

28  if the harassing conduct has unreasonably interfered with the plaintiff's work performance or

United States District Court
Northern District of California

17

created an intimidating, hostile, or offensive working environment." Cal. Gov't Code § 12923(b) (effective January 1, 2019). Moreover, FEHA provides that "[h]arassment cases are rarely appropriate for disposition on summary judgment." Cal. Gov't Code § 12923(e). Thus, for example, in *Doe v. Wells Fargo Bank, N.A.*, the court found that the plaintiff's supervisor was not fraudulently joined[6] where the plaintiff asserted a FEHA harassment claim against him based almost entirely on "commonly-necessary personnel-management actions—e.g., determining job or project assignments, provision of support, and meeting attendance decisions"—but where the plaintiff also alleged that the supervisor had made an offensive comment that the plaintiff would want to perform a sexual favor upon hearing good news. *Doe*, No. CV 19-5586-GW-PLAX, 2019 WL 3942963, at *6 (C.D. Cal. Aug. 19, 2019).

Here, Valdovinos has testified to numerous offensive comments indicating O'Hair's bias against her sex, national origin, and disability. She has also testified that O'Hair mistreated her in ways ranging from "constant" (not isolated or sporadic) sexist comments, to crudely criticizing her job performance in front of their client, to directing the engineers who reported to him not to respond to her requests. A jury could reasonably conclude that conduct was sufficiently severe or pervasive to support this claim, and that it was based on any or all of the protected classes that Valdovinos has asserted.

Defendants contend that Valdovinos cannot "aggregate" offensive comments by O'Hair pertaining to different protected categories to support a harassment claim. Reply at 6; *see* Mot. at 15–17. As Valdovinos correctly argues in her opposition, federal courts considering harassment claims under Title VII have held to the contrary. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) ("It would not be right to require a judgment against Hafford if the sum of all of the harassment he experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to 'pervasive'

---

[6] Fraudulent joinder was at issue in *Doe* because a plaintiff can only bring a discrimination claim under FEHA against an employer, while a harassment claim can also lie against an individual supervisor. The question of whether the plaintiff could state a viable harassment claim was therefore relevant to determining whether the individual defendant (who destroyed diversity jurisdiction) was properly joined.

United States District Court
Northern District of California

harassment.").  Defendants cite no California authority rejecting that approach and offer no reason why the California courts would differ.  *See Guz*, 24 Cal. 4th at 354 (noting that "California courts look to pertinent federal precedent" regarding Title VII to guide their interpretation of FEHA). Regardless, a jury could reasonably conclude here that O'Hair's purported instances of mistreating Valdovinos that were not explicitly tied to any protected class were motivated by the animus he purportedly stated towards any one of the protected categories at issue, and could find such treatment sufficiently severe even without aggregating the various overtly bigoted statements that Valdovinos testified she experienced and observed.

Defendants' motion for summary judgment is DENIED as to Valdovinos's harassment claims.

### E.    Retaliation Claim

"To assert a prima facie retaliation claim under FEHA, 'the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action.'"  *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 868 (9th Cir. 1996) (quoting *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992)).

Defendants do not dispute that Valdovinos's complaint to human resources was a protected activity.  As discussed above in the context of her discrimination claims, Valdovinos has also provided sufficient evidence from a which a jury could find an adverse employment action at least in the form of her purported constructive discharge.

While Defendants focus primarily on their argument that Valdovinos has not shown an adverse employment action, they also suggest that she has not shown causation, asserting that Valdovinos "does not know whether" O'Hair's instruction to his engineers to stop speaking to her "occurred before or after her [first] complaint to human resources."  Mot. at 20 (citing Jones Decl. (dkt. 42-1) Ex. A (Valdovinos Dep.) at 152:1–154:10); Reply at 5–6 (same).  That assertion misstates the record.  While Valdovinos testified that she could not "recall the specific date" that change occurred, *see* Jones Decl. Ex. A (Valdovinos Dep.) at 153:11–154:1, her testimony on the subject is situated in a discussion of the ways that her work experience "got worse" after she made

her complaint, *see id.* at 147:11–154:21.  Defense counsel only asked Valdovinos when the change occurred, and when she testified that she did not recall the exact date, counsel did not ask specifically whether it occurred before or after she made her complaint.  *See id.* at 153:11–154:1. Viewing the record in the light most favorable to Valdovinos, a jury could conclude that O'Hair only asked his engineers to stop cooperating with her after she made her complaint, and might infer that he did so because of her complaint.

Valdovinos also testified that O'Hair began berating her job performance in front of clients at Workday after she made her complaint.  Workman Decl. Ex. E (Valdovinos Dep.) at 147:11–20. And, while not addressed by the parties, a jury could reasonably infer that O'Hair knew or suspected that Valdovinos made the complaint against him based on the small size of the C&W team at Workday and evidence that Valdovinos had repeatedly objected to his crude jokes and conduct.  *See, e.g.*, Workman Decl. Ex. K ("I told both of them you can't say those things and they both just laughed . . . ."); Workman Decl. Ex. M at -75 ("[A]nd I turned around and told him, Kevin that is not funny, totally not funny.").

Defendants' motion is DENIED as to Valdovinos's retaliation claim.

### F.    Failure to Prevent Discrimination

FEHA makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment . . . from occurring."  Cal. Gov't Code § 12940(k).  A plaintiff seeking to recover on a failure-to-prevent-discrimination claim under FEHA must show that: (1) the plaintiff was subjected to discrimination; (2) the defendant failed to take all reasonable steps to prevent discrimination; and (3) that failure caused the plaintiff to suffer injury, damage, loss or harm.  *Leland v. City & County of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008).

As discussed above, a jury could reasonably conclude that Valdovinos continued to experience discrimination after her first complaint to the C&W human resources department in that O'Hair continued to make bigoted comments on an ongoing basis, instructed his engineers not cooperate with Valdovinos, advocated for the clients at Workday to have her fired, and subjected her to unreasonable demands.  Valdovinos offers expert testimony, which Defendants have not

20

moved to exclude, that C&W's failure to investigate her complaint more thoroughly and take more action to prevent discrimination fell below the customary standard of care.  *See* Workman Decl. Ex. AA (Thomas Decl.) ¶ 12.  A jury could reasonably credit that opinion to conclude that C&W did not take all reasonable steps to prevent discrimination, and could reasonably find that Valdovinos was harmed as a result.  Defendants' motion is DENIED as to this claim.

## IV.     CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: May 10, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California